## Case No. 17,005.

### VOSE v. ALLEN.

[2 Am. Law Reg. 563; 12 N. Y. Leg. Obs. 100; 30 Hunt, Mer. Mag. 331.]

District Court, S. D. New York. Feb., 1854.[1]

AFFREIGHTMENT—BILL OF LADING—LOSS OF CARGO —DELIVERY—NOTICE TO CONSIGNEE.

1. A bill of lading was signed by the master of a bark at Belfast. acknowledging to have received 220 tons of pig iron, to be delivered at the port of New York. About fifty tons of the iron was lost at New York. while the bark was discharging her cargo, by the breaking and sinking of the pile wharf or bridge upon which the iron had been improperly placed; and for this loss the bark was libeled in admiralty. *Held*, that the iron was lost before delivery to the consignees by the carrier, and that by the terms of the bill of lading the bark was liable for such loss.

---

[1] [Affirmed in Case No. 17,006.]

2. The liability of a carrier under a bill of lading continues until the merchandise is safely delivered to the consignee at the port of discharge, or placed in such a situation there as to be equivalent to a safe delivery, and the carrier is not discharged of the custody of the goods until this is done.

[Cited in Kennedy v. Dodge, Case No. 7,701.]

3. In regard to foreign voyages, under a bill of lading in the usual form, the carrier is not bound to make a personal delivery of the merchandise to the consignee, but it is sufficient if he lands it at the proper wharf, and in the ordinary manner, and gives reasonable notice to the consignee thereof. Such landing, with such notice, is equivalent to a personal delivery.

In admiralty.

Benedict, Scoville & Benedict, for libelants.
Owen & Betts, for respondent.

INGERSOLL, District Judge. The libel in this case is filed by Francis Vose, Charles L. Perkins, and John B. Kettell, against Thomas Allen, the owner of the British bark Majestic, for the recovery of the value of a quantity of pig iron, shipped at Belfast, Ireland, by Ralston, Goodwin & Co., on board the Majestic, to be carried to the port of New York, and there, at said port, the dangers of the seas only excepted, to be delivered to the libelants or their assigns. About fifty tons of the iron, of the two hundred and twenty tons so shipped, was lost at the port of New York, while the Majestic was discharging her cargo, by the breaking and sinking of a pile wharf or bridge upon which the iron was placed when being landed from the bark, and the claim of the libelants is, that it was so lost before it was delivered to them by the carrier, according to the terms of the bill of lading executed at the time the iron was shipped at Belfast.

The bill of lading which bears date the 26th day of April, 1852, and was signed by the master of the Majestic, at Belfast, acknowledges that Ralston, Goodwin & Co. had shipped in good order on board the Majestic, then lying in the harbor of Belfast, two hundred and twenty tons of pig iron, to be delivered in the like good order at the port of New York, the dangers of the seas only excepted, unto the libelants or to their assigns, he or they paying freight at the rate stated in the bill of lading. The bill of lading is in the ordinary form, with the addition of the following clause, inserted in the margin thereof, namely—"Iron to be discharged by the consignees in five days after the vessel's arrival at New York, or pay demurrage of $25 a day after that time. The above clause means five working days from the time the vessel is ready to discharge."

The libelants claim that by virtue of this additional clause in the margin of the bill of lading, they have more rights in reference to the unlading of the iron than they otherwise would have had; that by this additional clause they had five working days, from the time the vessel was ready to discharge, to unload the iron themselves; that they had a right, by the stipulation contained in this additional clause, at any time within such five working

days, to designate and select the wharf at which the iron should be discharged; that before the expiration of the five days the iron was lost; that the wharf at which the cargo of the Majestic was discharged was selected by the captain of the bark, without their concurrence; that they requested the captain to discharge at another wharf, which, though it was occupied at the time, would have been vacant before the expiration of such five working days; and that, therefore, no discharge of the iron at any wharf selected by the captain without their concurrence, within such five working days, although the captain may have given them notice of such discharge, would in law be deemed a delivery of the iron to them, according to the terms of the contract, as expressed in the bill of lading.

The necessities of the case, as I view it, upon the evidence as exhibited on the trial, do not require the expression of an opinion upon this claim as made by the libelants. The consideration of it, therefore, will be waived, and the case be considered as it would be, were not this additional clause appended to the bill of lading; and, in conformity with the claim of the respondent, that will be viewed as the contract of the parties, which is imported by a bill of lading in the ordinary form, governed by the same legal rules in its construction as would govern the instrument upon which the libel is founded, were not the additional clause appended to it.

In order to come to a correct result, it is necessary to ascertain what the facts in the case are; what the law is on the subject of the liabilities of common carriers of goods for hire—when they begin, how long they continue, and when they cease, or when the carrier discharges himself from the custody of the goods in his character of common carrier, and then apply such law to such facts in the case. The Majestic having, on the 26th of April, 1852, received at Belfast the 220 tons of pig iron for the purposes named in the bill of lading, soon thereafter sailed for her port of destination. She arrived in the harbor of New York on Sunday, the 20th day of June, of the same year. The vessel was consigned to Edmiston & Brothers, agents of the ship. The iron was consigned to the libelants. On Monday, the 21st of June, the captain of the Majestic reported himself to the libelants, and inquired of them where he was to discharge. The libelants sent their clerk to find a vacant berth. No berth vacant could be found on the North river below pier No. 39. The libelants requested that she might discharge somewhere between Washington Market and the Battery, and named piers No. 8 and No. 9; but neither of these piers was then vacant. The captain, on Tuesday, the 22d of June, hauled the vessel into pier No. 39, which was not between Washington Market and the Battery. On the 22d of June, Edmiston & Brothers wrote to the libelants, informing them that the Majestic was berthed at pier No. 39 North river, and was prepared to discharge her cargo, and re-

quested them to furnish them (Edmiston & Brothers) with a permit for the iron, that the vessel might commence landing it as early as possible. The custom house permit was furnished by the libelants and sent to Edmiston & Brothers on Wednesday, the 23d of June, and on Thursday, the 24th, the captain began to discharge the cargo. Pier No. 39 was about 300 feet long. The outer end of it, for about 40 feet, was solid. The remainder was what is called a bridge pier, built on piles. The vessel continued to discharge the iron on the pile part of the pier, until about 11 o'clock a. m. on Friday, at which time the first lieutenant of police, of the 5th ward, in which ward pier 39 was, observing a greater quantity of iron on the pier than he thought was safe, spoke' to the assistant dock-master, and told him to go on board and order them to stop discharging. The assistant dock-master immediately went on board, and ordered those on board not to land any more iron on the pier. They for a time ceased. On the afternoon of the same day the dock-master noticed that they were again discharging, and being of opinion that the pier, with the quantity of iron then on it, was not safe, ordered those on board to knock off, and to cease discharging. Upon this order being given, those on board again stopped. On the morning of Saturday, the 26th, they again went to discharging the iron, and continued till about 11 o'clock, when, from the weight of the iron on the pier, the pier broke down, and the iron upon it was precipitated into the water, and about fifty tons of it totally lost. At the time the pier broke down, there were about 150 tons of the iron upon it, and placed in such manner that it caused the breaking of the pier. On Friday, the 25th day of June, in the forenoon, a written notice was sent to the office of libelants by Edmiston & Brothers, notifying them that the pier, upon which a portion of the iron had been discharged, was supposed to be in danger, and requesting them to remove it. After this notice, although none of the iron was removed from the pier, an additional quantity was discharged from the vessel and placed on the pier, until 150 tons had been there placed, when the pier fell. At the time the order was given, on Friday, to stop discharging, there were 70 or 80 tons of iron on the pier. Pier 39 was a well built pier, but the quantity of iron placed upon it, and the manner in which it was placed upon it, it being accumulated too much in one spot, caused the disaster by which a portion of the iron was lost. ·

There is some contradictory evidence in regard to a portion of the facts as above set forth, but the preponderance of testimony is such that there can be no reasonable doubt in regard to any of them. These facts being found, the next question is, what is the law on the subject of the liabilities and responsibilities of common carriers of goods for hire in a case of this kind; when they begin, how long they continue, or when they cease; or when the carrier discharges himself of the custody of the goods in his character of common carrier? These liabilities and responsibilities commence when the goods are placed on board the carrying vessel; they continue during the voyage, and until the goods are safely delivered to the consignee at the port of discharge, or are placed in such a situation at such port of discharge, as either by law or general usage is equivalent to such delivery to the consignee, and until they are either delivered to the consignee, or are placed in such a situation at the port of discharge, as is either by law or general usage equivalent to such personal delivery, the carrier is not discharged of the custody and safety of the goods, but is responsible for the same. It is claimed by the libelants that the iron, though safely carried to the port of discharge, was not at such port either safely delivered to them, or safely placed in such a situation as is, either by law or general usage, equivalent to such personal delivery.

The law and general usage in this country in regard to foreign voyages, or goods brought from a foreign country, seems now to be well settled, and appears to be this: that under a bill of lading in the ordinary form, the carrier is not bound to make a personal delivery of the goods to the consignee; but it will be sufficient if he lands them in a proper manner at the usual wharf or proper place of landing, and gives due and reasonable notice thereof to the consignee. Such landing, with such notice, is equivalent to a personal delivery to the consignee. Ang. Carriers, § 310. Such landing-place, in order to make it equivalent to a personal delivery, must be a proper place for landing, and the landing must be made in a proper manner. No unsafe landing-place can be a proper landing-place, and no unsafe mode or way of landing can be considered as a proper mode or way of landing the goods.

It has been sometimes claimed, when the question of the liability of common carriers has been presented before courts, that where the consignee is not the owner of the goods, but is a third person, the rule is a little different; and that in such a case the carrier, when there is no personal delivery, in order to make his responsibility cease, must not only land the goods in a proper place, and give due and reasonable notice thereof to the consignee, but that he must also, after the goods are unladen, secure them by housing or otherwise, if no consignee appears, or if he neglects or refuses to accept the goods. The district judge of the Southern district of New York, when the case of The Grafton [Case No. 5,655], was before him, decided, "that in a well settled course of trade, such as existed in New York, in relation to coasting vessels, the delivery of a cargo on the dock, with notice to its owners of the time and place of unlading them, placed the cargo at their risk, and discharged the vessel from liability. But that in case the cargo was addressed to a mere consignee, the vessel would be under the further obligation to secure the property, after it was unladen, if no consignee

appeared, or if he refused to accept the goods."

There are many good and substantial reasons why the carrier should be required to do more, where there is no personal delivery in the case, when the consignee is a third person, than should be required of him when the consignee is the owner of the goods. But waiving the consideration of the question whether a different rule exists in the one case from what exists in the other, I would consider this case as if the consignee were .the owner of the goods. The carrier may not be bound under a bill of lading in the ordinary form to unlade his cargo at the place selected by the consignee. If, however, the carrier selects the place to land the goods, he must select a good and safe and proper place for landing them. What would be a good and safe and proper place for landing one kind or quality or quantity of goods, would not be a good and safe and proper place for landing another kind or quality or quantity of goods. Has, then, the carrier, in this case, done that which is equivalent to a personal delivery of the iron to the consignee? If he has safely unladen it in a safe and proper place, and in a safe and proper manner, and given due and reasonable notice to the consignee, then he has. If he has not, then he is liable for the damage which has been sustained by the loss of the iron, occasioned by the breaking of the pier upon which it was by the carrier placed.

On Friday, the 25th of June, at about 11 o'clock, a. m., about seventy or eighty tons of the iron had been discharged and placed on the pier. The assistant dockmaster, seeing that quantity on the pier and the manner in which it was placed, and that those on board were in the act of discharging more, and apprehending danger, notified the captain of the Majestic, not to discharge any more on the pier. For a time those on board the vessel stopped discharging. In the afternoon of the same day, however, they recommenced. when the dockmaster, apprehending danger, ordered them to stop. On the morning of Saturday, the 26th of June, they continued to discharge the iron on the pier, up to about 11 o'clock, when about 150 tons of it having been placed on the pier, the pier, from the weight of the iron upon it, broke down, and the iron was precipitated into the water, and a good portion of it, about fifty tons, was lost. The captain in his deposition says, that on Saturday they continued to discharge until the pier fell. The captain was warned of the danger, but persisted in overloading the pier, by which the pier broke. The pier was safe and proper for a certain quantity of iron, but not safe and proper for 150 tons placed on it in the manner that this iron was placed. For the quantity placed on the pier, in the manner in which it was placed, it was not safe, and therefore not a proper place. Of this the captain was notified before the danger had been encountered. The carrier, therefore, has not safely landed the iron in a proper and safe place, and in a proper and safe manner for the quantity that was discharged. He has

not, therefore, done that which is equivalent to a personal delivery of the iron to the consignee; for, to do that, it is necessary that he should have landed it in a proper place, a place proper for the amount that was landed. By his not complying with the stipulation contained in the bill of lading, to safely discharge the iron in a proper place, the loss has happened, and he must be answerable for the damage which has been occasioned.

It is contended, however, by the respondent, that the claim for this damage is not such a claim as can be enforced in a court of admiralty; that the cause of action, if any exists, had its origin on the land; that the damage occurred by an act done on the land and not on the water. The claim which the libelants make is for damages for the violation, by the respondent. of a maritime contract. entered into by him to safely carry the iron from Belfast to New York,· and there safely deliver it to the libelants. And the ground of complaint is, that it was not safely delivered. After the decision in the case of the Grafton, above referred to, it is not necessary to dwell on this point. That case was a libel in rem, filed in the district court, and upon a bill of lading for the carrying of a quantity of hemp from New Orleans to New York, and there safely delivering it to the libelants. After the hemp was discharged on the wharf, and not before, a portion of it was damaged by rain, and for that damage a recovery was had.

The decree of the court therefore is, that the libelants do recover the amount of the damage occasioned- to the iron by the breaking of the pier, and that it be referred to a commissioner to ascertain and report what that damage is.

[Upon an appeal to the circuit court. the decree of this court was affirmed. Case No. 17,-006.]